1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KHALID O. RAHMAN,

       Plaintiff,

    v.

PIERCE COUNTY, *et al.*,

       Defendants.

Case No. C06-5262 BHS/KLS

REPORT AND
RECOMMENDATION

**Noted for:**
**March 21, 2008**

Before the Court is the motion for summary judgment of Defendants Pierce County, Paul Pastor, Brett Karhu, John Delgado, A. Jackson and Juliette Pohl-Y-Baca.[1]  (Dkt. # 50).  In support of their motion, Defendants provide the Declarations of Kawyne A. Lund, John Delgado, Brett Karhu and Juliette Pohl-Y-Baca,.  (Dkt. # 51, Exhs. 1, 2, and 13, with attachments[2]).  Plaintiff has not responded to Defendants' motion, although he has had ample time to do so.  Under Local Rule 7 (b)(2) failure to file papers in opposition to a motion may be deemed by the Court as an admission that Defendants' motion has merit.

---

[1]Plaintiff's claims against Defendants Stephen E. Friederick and C.Z. Anderson were previously dismissed on summary judgment.  (Dkt. # 46).  Defendants State of Washington, Harold Clarke, D. Ang, A. Wedvic, T. Panek, M. Bollinger and Allen Hayter also move for summary judgment dismissal.  (Dkt. # 47).  That motion is the subject of a separate Report and Recommendation. (Dkt. # 56).

[2]By Praecipe, Defendants submitted the signed Declaration of Defendant Pohl-Y-Baca at Dkt. # 53.

REPORT AND RECOMMENDATION - 1

After careful review of Defendants' motion, supporting evidence, the balance of the record, and viewing the facts in the light most favorable to the Plaintiff, the undersigned recommends that Defendants ("the County Defendants") are entitled to dismissal of the claims against them because Plaintiff has failed to state a violation of his constitutional rights.

## I. INTRODUCTION

On June 20, 2006, Plaintiff filed his Amended Complaint *pro se*, against County Defendants, treating physicians Drs. Andersen and Friedrick, and personnel of the Washington Department of Corrections, where he is currently incarcerated, for dog bites he received during his arrest on May 14, 2003 and medical treatment he received following that arrest at St. Clare Hospital in Lakewood, Washington.  (Dkt. # 4).   Drs. Anderson and Friedrick were dismissed from this action on September 14, 2007.  (Dkt. # 46).

Plaintiff alleges the County Defendants violated his Fifth, Eighth and Fourteenth Amendment rights in using excessive force during his arrest and in providing medical treatment while he was detained at the Pierce County Detention and Corrections Center.  (PCDCC).  (Dkt. # 4, pp. 7-11; 12-14).

## II. FACTS

A.    **Facts Relevant to Incidents Surrounding Arrest**

At approximately 2 a.m. on May 14, 2003, Deputy John Delgado saw Plaintiff and passenger Denise Nirsch, driving a stolen vehicle.  (Dkt. # 51, Exh. 1).  Deputy Delgado turned on his emergency lights and sirens to pull over the Plaintiff.  *Id.*   Deputy Delgado explains the high-speed chase that ensued in his police report as follows:

> [T]he suspect made a U-turn and back on to Canyon Road and proceeded northbound ...The speeds at this time were 50 m.p.h. in a 35 m.p.h. zone.  The suspect vehicle then turned westbound onto SR 512, the speeds reached 80 m.p.h. in a 35 m.p.h. zone.  The suspect vehicle exited ...at the last second, nearly crashing on the off-ramp...the suspect vehicle turned westbound [and then] the suspect turned south into a bank parking lot

REPORT AND RECOMMENDATION - 2

> where he made a loop and then drove eastbound...Again, the suspect vehicle nearly
> crashed.  Speeds reached 90 m.p.h. in a 35 m.p.h. zone while driving eastbound...The
> suspect then turned south into the Golden Given Apartments.  Once inside the
> apartment complex the suspect vehicle struck a parked vehicle...and then the driver
> ...climbed over the front passenger ...and exited the vehicle.  The vehicle was still
> moving when [Plaintiff] exited.

*Id.*, Exh. 3.  Deputy Brett Karhu joined the chase at 1:59 a.m.  *Id.*, Exh. 3 and 4.  Deputy Karhu's

emergency lights and sirens were also activated.  *Id.*

Deputies Karhu and Delgado exited their cars and Deputy Karhu released a K-9 unit, "Harley"

in Plaintiff's direction using a "direct application."  (Dkt. #51, Exh. 2, p. 2).  A "direct application"

does not require the use of a warning to the suspect prior to release of a K-9 unit.  *Id.*  Harley caught

up with Plaintiff and secured him until the Deputies arrived.  *Id.*, Exh. 1 and 2.

When Deputy Karhu caught up with Plaintiff and Harley, Plaintiff had wrapped his leg around

Harley's neck and was trying to choke the dog.  *Id.*, Exh. 2.   Plaintiff resisted arrest and refused to

comply with numerous orders from Deputies Delgado and Karhu to give up his hands so that they

could safely handcuff him.  *Id.*  Deputy Delgado was extremely concerned that Plaintiff was armed

with a weapon.  *Id.,* Exh. 1.   When Plaintiff continued to resist arrest and would not comply with

repeated orders to give up his hands, Deputy Delgado struck him on the elbow with his flashlight to

secure his compliance.  *Id.*

After Plaintiff was safely in custody, Deputy Karhu ordered Harley to release Plaintiff and

summoned medical aid.  *Id.*, Exhs. 1 and 2. First aid was administered at the scene and Plaintiff was

then transported to the hospital.  *Id.*[3]   Deputy Delgado and Deputy Karhu perceived Plaintiff's wounds

---

[3]Plaintiff was charged with several felonies including stealing a car in violation of RCW
9A.56.140(1) and RCW 9A.56.150(1), attempting to elude a pursuing police vehicle in violation of
RCW 46.61.024, striking an unattended vehicle in violation of RCW 46.52.010, obstructing law
enforcement in violation of RCW 9A.76.020(1) and resisting arrest in violation of RCW 9A.76.040(1).
*Id.*, Exh. 6. Plaintiff was taken to PCDCC to await trial.  On June 18, 2003, Plaintiff pled guilty to
felony counts of possession of stolen property and attempting to elude a pursuing police vehicle and

REPORT AND RECOMMENDATION - 3

to be minor in nature.  *Id.*

In his Affidavit attached to his Amended Complaint, Plaintiff declares that Deputy Delgado purposefully rammed into the back of his car with the intent to cause him harm. (Dkt. # 4, Exh. 1, p. 1). Plaintiff had to flee the vehicle in fear of his life.  *Id.*   The Plaintiff alleged in his Amended Complaint that Deputies Karhu and Delgado encouraged Harley to continue his attack with commands of "get the nigger," and "get him" and "eat him," (Dkt. # 4, p. 8), but he did not include that statement in his Affidavit.  Deputy Karhu jerked on Harley, causing the dog to wound him further.  (Dkt. # 4, Exh. 1, p. 1).

Plaintiff also testified that both deputies beat him with their metal flashlights.  *Id.*, Exh. 1, pp. 1-2.  Plaintiff screamed for help and lay in his own blood.  *Id.*, Exh. 1, p. 2.  Plaintiff testifies that the deputies then threw him in a muddy drainage ditch and left him there to die for approximately one-half hour before placing him in the squad car and taking him to St. Clare Hospital for treatment.  *Id.*

**B.      Facts Relevant to Medical Treatment**

Plaintiff was admitted to St. Clare Hospital in Lakewood, Washington at 3:08 a.m.  *Id.*, Exh. 8. Plaintiff had three punctures in his leg, two near the right knee and one on the upper thigh.  *Id.*, Exh. 9. While in the emergency room, a local anesthetic was administered to Plaintiff's wounds, his wounds were evaluated, cleaned, irrigated extensively, sutured and dressed, and he was given a medication for pain and an antibiotic and was given a prescription for the antibiotic on discharge.  (Dkt. # 45, p. 5).[4] An x-ray of his left elbow revealed mild swelling, but no fracture.  (Dkt. # 51, Exh. 16; Dkt. # 41, Exh.

---

was sentenced to 14 months in state prison.  *Id.*, Exh. 7.

[4]Plaintiff alleges in his Complaint and testifies under oath that the treatment he received from Drs. Friedrick and Andersen at St. Clare Hospital was substandard.  However, this Court previously found that Plaintiff has provided no evidence establishing that these Defendants were deliberately indifferent to his serious medical needs and granted summary judgment in their favor.  (Dkt. # 46).

REPORT AND RECOMMENDATION - 4

A, p. 7).

Deputy Karhu followed Plaintiff to the hospital and photographed all of his wounds.  *Id*., Exhs. 2 and 11.  When Deputy Karhu was taking photographs, Plaintiff's demeanor changed, "[W]hen I got to the hospital Khalid was as calm as could be and actually laughed about how much of a show he had put on at the scene."  *Id*., Exh. 2.

Plaintiff arrived at PCDCC at 5 a.m. on May 14, 2003.  *Id*., Exh. 12.  Plaintiff was housed in cell "4SB 4," at the request of the health clinic.  That cell is reserved for inmates with medical needs so nurses can more closely monitor the inmate.  *Id*., Exh. 13.  In addition to priority housing, Plaintiff received medical treatment the same day he arrived.  *Id*., Exh. 14.  Plaintiff was given Augmentin, an antibacterial, and Vicodin for pain.  *Id*.  This treatment was in addition to the care he received only hours earlier at St. Clare Hospital.  *Id*.

Nurses of the PCDCC continued to change the Plaintiff's dressings, clean his wounds and apply antibacterial medicine to the healing wounds.  *Id*., Exh. 15.  On June 3, 2003, it was determined that Plaintiff was healthy and could be housed in the General Population.  *Id*.  Records reflect that prior to June 3, 2003, Plaintiff had been seen by prison medical staff five times between May 14, 2003 and June 3, 2003 (5/15, 5/18, 5/19, 5/22, 5/28).  (Dkt. # 51, Exhs. 19, 24-28).

On June 13, Plaintiff submitted a kite to the medical staff stating, "I have an STD because my [sic] growing is sore and I have sores on my penis and my stomach hurts bad."  *Id*., Exh. 17.  The Plaintiff was seen June 14, when medical staff noted "unremarkable swelling of testicles" and a few "small" sores.  *Id*., Exh. 18.  On June 14, Plaintiff was seen by medical staff at 4 p.m., who noted "unremarkable swelling" and "few small sores."  *Id*.  Plaintiff was given 800 mg of ibuprofen and noted for follow-up the same day.  *Id*.  At 8 p.m. the same day, Plaintiff was seen by a physician's assistant, who noted "decreased discomfort" with a follow-up for the next day.  *Id*.

REPORT AND RECOMMENDATION - 5

1    On June 15 at 9:50 a.m., medical staff noted Plaintiff's scrotum was swollen. *Id.*, Exh. 19.

2    However, medical staff continued to believe the swelling to be related to an STD because Plaintiff told

3    the nurse he had herpes and unprotected sex without condoms. *Id.* Accordingly, Plaintiff was given

4    Vicodin for discomfort and Acyclovir (medication for herpes) and was noted for follow-up the next

5    day. *Id.*

6

7    On June 16 at 3:15 a.m. a corrections officer notified medical staff that Plaintiff was

8    complaining of pain and swelling related to the herpes outbreak. *Id.*, Exh. 19. Plaintiff was given cool

9    packs and 800 mg of ibuprofen. Later that day, Plaintiff was summoned for a follow-up visit with

10   physician's assistant Pohl-y-Baca who performed a thorough examination of Plaintiff and inquired into

11   the wounds being related to herpes or possibly HIV. *Id.* Plaintiff believed the wounds to be related to

12   a dog bite. *Id.* Defendant Pohl-y-Baca's notes state "did not have dog bite to scrotum." However, she

13   ordered a culture to diagnose Plaintiff's lesions and swelling, including tests for HIV, herpes and staph

14   infection. *Id.*, Exhs. 20 and 27. The PA continued "acyclovir" treatment. *Id.*, Exh. 27. A follow-up

15   exam was noted for June 18.

16

17   On June 18, the test results came back negative for HIV. *Id.*, Exh. 27 and 20. Plaintiff was

18   started on Keflex to fight skin infection and scheduled for the next day. *Id.*, Exh. 27. Keflex is an

19   effective treatment against several types of skin bacteria. *Id.*, Exh. 13.

20

21   On June 19, Plaintiff was seen by Dr. Miguel Balderrama. *Id.*, Exh. 27. Dr. Balderrama

22   examined the dog bites and saw no evidence of infection. *Id.* When the doctor attempted to examine

23   the area of infection, Plaintiff would not allow him to do so. The medical records reflect that "Patient

24   did not allow exam of external genitalia." *Id.*

25   On June 20, medical staff received preliminary results that Plaintiff was positive for MRSA

26   (Methicillin-resistant Staphyl9ococcus aureus), a type of staph infection, and prescribed Clindamycin

27

28   REPORT AND RECOMMENDATION - 6

that same day. *Id.*, Exhs. 21, 27.   Clindamycin is an effective treatment against MRSA.  (Dkt. # 51, Exh. 13).

Plaintiff's treatment was continued and he was seen for follow-ups on June 21, 22, 23 and 24. *Id.*, Exh. 28.  Plaintiff was transferred to state prison on June 24, 2003 to fulfill his 14 month sentence. *Id.*, Exh. 22.  His transfer order from PDCC medical specifically states the Plaintiff had scrotal lesions, cellulitis (skin infection), MRSA and had been treated with noticeable improvement with Clindamycin. *Id.*

Plaintiff testified in his affidavit that he was ignored by jail medical staff and was not given any pain pills or antibiotics until the next day shift, that jail medical staff did not alleviate his pain and that Defendants Jackson and Pohl-y-Baca denied him treatment and proper medical care on numerous occasions.  (Dkt. # 4, Exh. 1, p. 2-3).  Plaintiff also alleges that Defendants Jackson and Pohl-y-Baca purposefully diagnosed herpes and treated him for that disease when they knew that he had tested negative for herpes and knew that the medication they were giving him would not help him, but would make his condition worse.  (Dkt. # 4, p. 13-14).

### III.  STANDARD OF REVIEW

In examining Defendants' motions, the Court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the opposing party must show that there is a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87

REPORT AND RECOMMENDATION - 7

1   (1986).  The opposing party must present significant and probative evidence to support its claim or

2   defense.  *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).

3                                        **IV.  DISCUSSION**

4
5           To state a claim under 42 U.S.C. § 1983, the defendant must be a person acting under color

6   of state law; and his conduct must have deprived the plaintiff of rights, privileges, or immunities

7   secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535

8   (1981), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986)**.**  Implicit in

9   the second element is a third element of causation. *See Mt. Healthy City School Dist. v. Doyle*, 429

10  U.S. 274, 286-87 (1977); *Flores v. Pierce*, 617 F.2d 1386, 1390-91 (9th Cir. 1980), *cert. denied*,

11  449 U.S. 875 (1980). When a plaintiff fails to allege or establish one of the three elements, his

12  complaint must be dismissed.

13
14  **A.       Plaintiff's Excessive Force Claim**

15          Plaintiff alleges that Defendants Karhu and Delgado violated his Eighth Amendment rights

16  when they used excessive force in arresting him.  (Dkt. # 4, p. 21-22).   Plaintiff testified that the

17  Deputies actively encouraged Harley to attack him and that Deputy Karhu jerked on Harley, causing

18  the dog to wound him further.  (Dkt. # 4, Exh. 1, p. 1).  Plaintiff also testified that both deputies

19  clubbed him with their metal flashlights.  *Id*., Exh. 1, pp. 1-2.

20
21          The use of force to effect an arrest is subject to the Fourth Amendment's prohibition on

22  unreasonable seizures.  *Graham v. Connor*, 490 U.S. 386 (1989).   Police dog bites to the arms or

23  legs are not considered "deadly force" and are therefore, properly analyzed under the *Graham*

24  criteria.  *Miller v. Clark County*, 340 F.3d 959, 962-63 (9th Cir. 2003).

25          In determining the reasonableness of a seizure effected by non-deadly force, "the nature and

26
27  quality of the intrusion on the individual's Fourth Amendment interests" should be balanced against

28  REPORT AND RECOMMENDATION - 8

"the countervailing governing interests at stake." *See Graham*, 490 U.S. at 396 (internal quotations omitted).  The Ninth Circuit teaches that the issue should be approached in the following manner:

> First, the gravity of the particular intrusion on Fourth Amendment interests are assessed by evaluating the type and amount of force inflicted.
>
> Second, the importance of the government interests at stake are assessed by evaluating: (1) the severity of the crime at issue, (2) whether the suspect imposed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.
>
> Third, the gravity of the intrusion on the individual is balanced against the government's need for that intrusion to determine whether it was constitutionally reasonable.

*Miller*, 340 F.3d at 964 (internal citations omitted).

**1.      Intrusion on Plaintiff's Constitutional Rights**

A court "assess[es] the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted." *Miller*, 340 F.3d at 964 (citing *Chew v. Gates*, 27 F.3d 1432, 1449 n. 19 (9th Cir. 1994)).  In this case, it is undisputed that Plaintiff was bitten by a police dog and that those bites can cause pain and bodily injury.  Defendants do not dispute that the intrusion on Plaintiff's rights was a serious one.

**2.      The Government's Interests at Stake**

The next step is to balance the intrusion on Plaintiff's rights against the countervailing interests of the government.  *Graham*, 490 U.S. at 396.  Relevant factors in determining the government's interest include, "the severity of the crime, whether the suspect posed an immediate threat to the safety of the officers or others, whether he was actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S at 396.

A review of the evidence reveals that all three factors weigh in favor of the government's countervailing interests.

REPORT AND RECOMMENDATION - 9

First, the severity of Plaintiff's crime is undisputed as Plaintiff pled guilty to possession of stolen property and eluding police.  (Dkt. # 51, Exh. 7).  Plaintiff was suspected of driving a stolen vehicle, was eluding police and was endangering the public by driving 90 miles per hour in 35 mile per hour zones.  (Dkt. # 51, Exhs. 1-5).  *See* e.g., *Miller*, 340 F.3d at 964 (citing *United States v. Hensley*, 469 U.S. 221, 229 (1985) ("The government has an undeniable legitimate interest in apprehending criminal suspects.")

Second, the evidence demonstrates that Plaintiff posed an immediate threat to the safety of the officers or others.  *Miller*, 340 F.3d at 964 (citing *Graham*, 490 U.S. at 396).  Plaintiff does not dispute that he led deputies on a high speed chase and that he fled from the car.  Plaintiff also does not dispute that he pled guilty for violating RCW 46.61.024 (felony suspect wanted for crime of attempting to flee from police by driving a car).  This crime evinces a willingness to threaten others' safety.  *Miller*, 340 F.3d at 965.  Deputy Delgado also testified that he did not know whether Plaintiff was armed and both Deputies Delgado and Karhu testified that Plaintiff resisted arrest and refused to comply with numerous orders to give up his hands so that they could safely handcuff him.  (Dkt. # 51, Exhs. 1-4).

Third, the Court must consider whether Plaintiff was "actively resisting arrest or attempting to evade arrest by flight."  *Miller*, 340 F.3d at 965.  As noted above, the evidence reflects that Plaintiff led the deputies on a high speed chase, fled into the night, and subsequently plead guilty to eluding.

### 3.      The Gravity of the Intrusion

Lastly, the Court considers the "dispositive question whether the force that was applied was reasonably necessary under the circumstances."  *Miller*, 340 F.3d at 967.  In *Miller*, the court found it highly relevant that the deputies had engaged in less forceful means to arrest the suspect including signaling with their emergency lights and siren, pursuing in the police cruiser and on foot.  *Id*.

The undisputed evidence demonstrates that the deputies in this case engaged in similar less forceful means of arrest.  The police records and testimony of Deputies Karhu and Delgado reflect that they followed Plaintiff's vehicle on a high speed chase for several minutes, during which time the emergency lights and sirens of their police vehicles were engaged.  (Dkt. # 51, Exhs. 1-4).  The record also reflects that after Plaintiff collided with the parked vehicle and fled the scene on foot, the deputies followed in pursuit.  *Id*.  Because it was at night and dark and Plaintiff was wearing dark clothing, the deputies released the K-9 unit to apprehend him.  *Id*.

In *Miller*, the Court noted that the use of a police dog was well suited to the task of safely arresting a suspect, that a police dog "neutralizes" the advantages of a fleeing suspect, and that the dog's acute vision neutralizes the situation of chasing a suspect in the dark.  *Id*. at 967.  Police dogs are well suited to "restrain" and "hold" suspects until deputies can arrive safely.  *Id*.  In *Mendoza v. Block*, the Ninth Circuit also found that it was objectively reasonable to use a police dog to find and secure a fleeing felon until he stopped struggling and could be handcuffed.  *Mendoza*, 27 F.3d 1357, 1363 (9th Cir. 1994).  The use of police dogs is also reasonable because unrestrained suspects have an opportunity to "hide, flee anew, to recover a weapon, to harm the dog, or to prepare to launch an ambush against the deputies."  *Id*. at 268.

The undisputed evidence in this case reflects that it was dark when Plaintiff fled the stolen vehicle on foot.  Plaintiff had already demonstrated a careless disregard for life in order to avoid apprehension by driving up to 90 miles per hour in 35 mile per hour zones.  (Dkt. # 58, Exhs. 1-4).  The record also reflects that when Deputy Karhu caught up with Plaintiff and Harley, Plaintiff had wrapped his leg around Harley's neck and was trying to choke the dog.  *Id*., Exh. 2.  Plaintiff resisted arrest and refused to comply with numerous orders from Deputies Delgado and Karhu to give up his hands so that they could safely handcuff him.  *Id*.  Deputy Delgado was extremely concerned that

Plaintiff was armed with a weapon.  *Id.,* Exh. 1.

Plaintiff alleges that the Deputies failed to call off the K-9 unit when they arrived.  (Dkt. # 4, Exh. 1, p. 1).  However, the Deputies testified that after Plaintiff was safely handcuffed, Deputy Karhu ordered Harley to release Plaintiff and summoned medical aid.  (Dkt. # 51, Exhs. 1 and 2).   Viewing this evidence in the light most favorable to Plaintiff, even if the Deputies waited until after they handcuffed Plaintiff to call off the K-9 unit, the Court does not find that the force used to restrain Plaintiff was unreasonable under the circumstances.  Had they released Harley earlier, Plaintiff could have hidden, fled anew, or harmed the dog or the deputies.  The medical evidence also reflects that the blow to Plaintiff's elbow resulted in mild swelling, supporting a conclusion that the force applied was reasonable under the circumstances.  (*See* Dkt. # 51, Exh. 16; Dkt. # 41, Exh. A, p. 7).

Plaintiff also testified that Deputy Delgado purposefully rammed his police car into the car driven by Plaintiff.  (Dkt. # 4, Exh. 1, p. 1).  While this is disputed by the officers, the dispute is not a material factual dispute.  The officers were involved in a high speed pursuit and there is no evidence before the Court that such a ramming violated the Plaintiff's constitutional rights nor is there any evidence that the ramming caused any injury to the Plaintiff.  In fact, the evidence from the Plaintiff is that he continued to elude the police on foot after the ramming occurred.

Viewing all of the evidence in the light most favorable to Plaintiff, the undersigned concludes that Plaintiff has failed to demonstrate that Defendants Karhu and Delgado violated his Eighth Amendment rights during his arrest.


**B.     Claim of Medical Indifference**

Plaintiff alleges that all the Defendants "were deliberately indifferent to the plaintiff's medical needs."  (Dkt. # 4, p. 22).

REPORT AND RECOMMENDATION - 12

1
2
3
4

Deliberate indifference to an inmate's serious medical needs violates the Eighth

Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97,

104 (1976). Deliberate indifference includes denial, delay or intentional interference with a

5
6

prisoner's medical treatment. *Id*. at 104-5; *see also Broughton v. Cutter Labs*., 622 F.2d 458, 459-

60 (9th Cir. 1980). To succeed on a deliberate indifference claim, an inmate must demonstrate that

7

the prison official had a sufficiently culpable state of mind. *Famer v. Brennan*, 511 U.S. 825, 836

8
9
10

(1994). A determination of deliberate indifference involves an examination of two elements: the

seriousness of the prisoner's medical need and the nature of the defendant's response to that need.

*McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992).

11
12

First, the alleged deprivation must be, objectively, "sufficiently serious." *Farmer,* 511 U.S.

at 834. A "serious medical need" exists if the failure to treat a prisoner's condition would result in

13
14

further significant injury or the unnecessary and wanton infliction of pain contrary to contemporary

15

standards of decency. *Helling v. McKinney*, 509 U.S. 25, 32-35 (1993); *McGuckin*, 974 F.2d at

16
17

1059. Second, the prison official must be deliberately indifferent to the risk of harm to the inmate.

*Farmer*, 511 U.S. at 834.

18
19

An official is deliberately indifferent to a serious medical need if the official "knows of and

20

disregards an excessive risk to inmate health or safety." *Id.* at 837. Deliberate indifference requires

21

more culpability than ordinary lack of due care for a prisoner's health. *Id.* at 835. In assessing

22

whether the official acted with deliberate indifference, a court's inquiry must focus on what the

23

prison official actually perceived, not what the official should have known. *See Wallis v. Baldwin*,

24

70 F.3d 1074, 1077 (9th Cir. 1995). In other words an official must (1) be actually aware of facts

25
26

from which an inference could be drawn that a substantial risk of harm exists, (2) actually draw the

inference, but (3) nevertheless disregard the risk to the inmate's health. *Farmer*, 511 U.S. at 837-8.

27
28

REPORT AND RECOMMENDATION - 13

1      Mere indifference, negligence or medical malpractice will not support this cause of action.

2  *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir. 1980).

3      The evidence reflects that Plaintiff was being treated for the dog bite wounds to his legs and

4  that he was diagnosed with MRSA on June 20, 2003.  Defendants do not dispute that either of these

5  conditions were serious medical needs.  (Dkt. # 50, p. 19)  However, Defendants argue that

6  Plaintiff's claim fails because PCDCC medical staff were not "deliberately indifferent" to Plaintiff's

7  serious medical needs.  The Court agrees.

8

9      Plaintiff also testified in his Affidavit that after he returned from St. Clare Hospital that he

10  was ignored by jail medical staff and was not given any pain pills or given any pain pills or antibiotics until

11  the next day shift.  (Dkt. # 4, Exh. 1, p. 2)   Plaintiff was booked into PCDCC at 5 a.m. and seen by

12  medical staff on the same day with follow-up medications and treatment.  (Dkt. # 51, Exhs. 12, 14).

13

14      Plaintiff also testifies in his Affidavit that jail medical staff denied him "treatment and

15  proper medical care numerous times."  (Dkt. # 4, Exh. 1).

16      The uncontroverted summary judgment evidence reflects that Plaintiff was incarcerated at

17  PCDCC for a little over one month.  (Dtk. # 51, Exhs. 12, 22).  Prior to being placed in General

18  Population, Plaintiff was seen by prison medical staff six times between May 14, 2003 and June 3,

19  2003 (5/15, 5/18, 5/19, 5/22, 5/28, 6/3).  (Dkt. # 51, Exhs. 19, 24-28).   After being placed with the

20  general population, Plaintiff had face-to-face meetings with medical personnel over twenty times in

21  just over a one month period of time. (5/14, 5/15 (twice), 5/18, 5/19, 5/22, 5/28, 6/3, 6/11, 6/14 (twice),

22  6/15 (twice), 6/16 (twice), 6/18, 6/19, 6/20, 6/21, 6/22, 6/23).  (*Id.*, Exhs. 19, 24-28.)

23

24

25      In addition, the Court does not find that PCDCC medical staff's failure to diagnose the MSRA

26  sooner was a disregard of Plaintiff's medical needs.  When Plaintiff complained of having an STD on

27

28  REPORT AND RECOMMENDATION - 14

June 13, medicines effective to combat herpes were administered and after those proved unsuccessful, additional tests were performed. *Id.*, Exhs. 17, 19-20[5]. As soon as results came back preliminarily positive for MRSA, medical staff prescribed effective medication to Plaintiff for that condition. *Id.*, Exh. 27. In addition, when Dr. Balderama attempted to examine the site of the infection, Plaintiff failed to cooperate. *Id.*

For the foregoing reasons, the Court finds that County Defendants are entitled to summary judgment on Plaintiff's claim of Eighth Amendment deliberate indifference.

**C.      Plaintiff's Claim for Failure to Train Medical Staff/Deputies**

In Count I and II of his Complaint, Plaintiff alleges that Pierce County failed to properly train its employees in the medical care of prisoners and for not properly funding training programs for its deputies. (Dkt. # 4, pp. 19, 21).

Because the Court finds that Plaintiff's Fourth and Eight Amendment rights were not violated, it need not and has not decided whether Defendant Pierce County could be liable for any constitutional violation under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

**D.      Equal Protection or Due Process Claims**

Plaintiff claims that "[i]n taking the retaliatory and punitive actions [described in his Complaint] . . . Defendants were deliberately indifferent to [his] right to be detained under human conditions," and have violated [his] right to be free from cruel and unusual punishment under the Eighth Amendment . . . and his rights to "equal protection and due process under the Fourteenth

---

[5]It is for this reason that Plaintiff's unsupported allegation that Defendants Jackson and Pohl-y-Baca purposefully diagnosed Plaintiff with having a sexually transmitted disease and knowingly treated him for a disease he did not have, must also fail. (*See* Dkt. # 4, p. 13). There is no evidence in the record to support such an allegation. On the other hand, the undisputed evidence reflects that Plaintiff complained of having an STD and PCDCC staff responded with the appropriate treatment until test results revealed that he was, in fact, suffering from MRSA.

1   Amendment to the United States Constitution."  (Dkt. # 4, p. 23).

2       To establish a violation of substantive due process a plaintiff is ordinarily required to prove

3   that a challenged government action was clearly arbitrary and unreasonable, having no substantial

4   relation to the public health, safety, morals or general welfare.  However, where a particular

5   amendment provides an explicit textual source of constitutional protection against a particular sort

6   of government behavior, that Amendment, not the more generalized notion of substantive due

7   process, must be the guide for analyzing a plaintiff's claims.  *Patel v. Penman*, 103 F.3d 868, 874

8   (9th Cir. 1996)(citations, internal quotations and brackets omitted); *see also County of Sacramento v.*

9   *Lewis*, 523 U.S. 833, 841-42 (1998).  Here, Plaintiff's challenge as to the conditions of his

10  confinement and medical treatment have been analyzed by the Court within the context of the

11  protection of the Eighth Amendment.

12

13      An Equal Protection claim under the Civil Rights Act, 42 U.S.C. § 1983, requires as a

14  necessary element, that defendants acted with the intent to discriminate. *Sischo-Nownejad v.*

15  *Merced Community College Dist.*, 934 F.2d 1104, 1112 (9th Cir. 1991). To sustain an Equal

16  Protection claim under 42 U.S.C. § 1983, Plaintiff must show that there was intentional and

17  purposeful discrimination between persons or classes. *Draper v. Rhay*, 315 F.2d 193, 198 (9th Cir.

18  1963), *cert. denied*, 375 U.S. 915 (1963) (*citing, Hoffman v. Halden*, 268 F.2d 280 (9th Cir. 1959)).

19  The Equal Protection Clause does not require conditions, practices, and rules at county and state

20  correctional facilities to be identical. *Cooper v. Elrod*, 622 F. Supp. 373 (D.C. Ill. 1985). The

21  United States Supreme Court has observed that "showing that different persons are treated

22  differently is not enough without more, to show a denial of Equal Protection." *Griffin v. County*

23  *School Board of Prince Edward Co.*, 377 U.S. 218, 230 (1964). Plaintiff must also demonstrate that

24

25  persons were "treated differently . . . because [they] belonged to a protected class." *Seltzer-Bey v.*

26

27

28  REPORT AND RECOMMENDATION - 16

1   *Delo*, 66 F.3d 961, 964 (8th Cir. 1995) (*citing Divers v. Department of Correction*, 921 F.2d 191,

2   193 (8th Cir. 1990)).

3          As discussed above, Plaintiff has failed to demonstrate that the Deputies' use of the police

4   dog or that their use of force during his arrest constituted excessive force in violation of his Fourth

5   Amendment right to be free from unreasonable seizures.  There is also no evidence before this

6   Court of intentional or purposeful discrimination towards Plaintiff because he belongs to a protected

7   class.   Accordingly, the undersigned recommends that Defendants are entitled to summary judgment

8   on Plaintiff's due process and equal protection claims.

9

10  **E.      State Claims**

11         **1.        Respondeat Superior**

12         A municipality is held liable only for those deprivations resulting from the decisions of its duly

13  constituted legislative body or of those officials whose acts may fairly be said to be those of the

14  municipality.  *Bosteder v. City of Renton*, 117 P.3d 316 (Wash. 2005), *superseded by statute on other*

15  *grounds*, 170 P.3d 570 (2007).  As noted above, Plaintiff has failed to identify any policy or custom,

16  therefore, the undersigned recommends that any claim based on respondeat superior against Pierce

17  County should be denied.

18         **2.        Claim for Intentional or Negligent Emotional Distress**

19         To establish negligent infliction of emotional distress under Washington law, Plaintiff must

20  show that Defendants breached a legal duty thereby causing Plaintiff to suffer objective symptoms

21  of emotional distress. See *Hunsley v. Giard*, 87 Wash.2d 424, 553 P.2d 1096, 1102-03 (1976) (en

22  banc). Such symptoms must be "susceptible to medical diagnosis and proved through medical

23  evidence." *Marzolf v. Stone*, 136 Wash.2d 122, 960 P.2d 424, 431 (1998). Plaintiff has produced no

24  evidence of a diagnosed emotional disorder.

REPORT AND RECOMMENDATION - 17

Plaintiff also brings a claim for the intentional infliction of emotional distress, otherwise referred to as the intentional tort of outrage.  To recover for the tort of outrage a plaintiff must prove: (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress. *Pettis v. State*, 98 Wn. App. 553, 990 P.2d 453 (1999).  To prove extreme and outrageous conduct, it is not enough to show that the defendant acted with an intent that was tortious or even criminal, or that he intended to inflict emotional distress, or even that his conduct can be characterized by malice. *Grimsby v. Samson*, 85 Wn.2d 52, 530 P.2d 291 (1975). Liability exists only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. *Hope v. Larry s Markets*,108 Wn. App. 185, 29 P.3d 1268 (2001).

The emotional distress complained of must be inflicted intentionally or recklessly. Bad faith or malice is not enough to prove an outrage claim. *Dicomes v. State*, 113 Wn.2d 612, 782 P.2d 1002 (1989).  The conduct must result in severe emotional distress to the plaintiff. *Brower v. Ackerley*, 88 Wn. App. 87, 943 P.2d 41141 (1997).

As noted above, Plaintiff has failed to demonstrate that Deputies violated his constitutional rights when they arrested him following the high speed chase using a police dog.  Plaintiff has also failed to demonstrate that PCDCC medical staff were indifferent to his medical needs.

In addition, it is not enough to show that a defendant has acted with malice, Plaintiff must show that the Deputies'conduct was outrageous.   The record is devoid of evidence of conduct by the Defendants that could in any way be considered "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Guffey v. State*, 690 P.2d 1163 (1984)(quoting *Grimsby v.*

REPORT AND RECOMMENDATION - 18

*Samson*, 530 P.2d 291 (1975)).

Accordingly, the undersigned recommends that County Defendants' motion for summary judgment as to Plaintiff's claims of negligent and intentional infliction of emotional distress be granted.

### 3.    Claim for Failure to Provide Adequate Medical Care

Plaintiff alleges in Count VI that Defendants are liable to Plaintiff under Washington Constitution, art. I, § 3 and art. I § 14, for failing to provide adequate medical care.  (Dkt. 4, p. 25) There is no cause of action for damages arising from alleged violations of the Washington State constitution.  *Blinka v. Wash. State Bar Ass'n*, 36 P.3d 1094 (2001); *Peters v. Vinatieri*, 9 P.3d 909 (2000).

To the extent Plaintiff's claims can be analyzed under RCW 7.70.030, which governs all civil actions arising for negligent medical treatment, any such claim must also be dismissed as Plaintiff has failed to provide expert opinion that PCDCC medical care fell below the proper standard of care and failed to demonstrate (or even allege) that "more likely than not" the medical negligence of PCDCC caused a harmful condition.  RCW 7.70.040; *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 226-27 (1989); *Atwood v. Albertson's Food Centers, Inc.*, 92 Wn.App. 316, 331 (1998).

Accordingly, the undersigned recommends that County Defendants' motion for summary judgment on Plaintiff's state law claims for failure to provide adequate medical care be granted.

### IV.  CONCLUSION

For the reasons stated above the Court should **GRANT** the State Defendants' motion for summary judgment (Dkt. # 47).  A proposed order accompanies this Report and Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report and Recommendation to file written

objections.  *See also* Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).  Accommodating the time

limit imposed by Rule 72(b), the Clerk of the Court is directed to set the matter for consideration on

**March 21, 2008**, as noted in the caption.


          DATED this  4th  day of March, 2008.




                                                    Karen L. Strombom
                                                    United States Magistrate Judge

REPORT AND RECOMMENDATION - 20